**Michele SHOMAKER, Personal Representative of the Estate of Edward C. Shomaker, Appellant,**

v.

**GEORGE WASHINGTON UNIVERSITY, Appellee.**

No. 93–CV–1089.

District of Columbia Court of Appeals.

Argued Feb. 2, 1995.

Decided Dec. 29, 1995.

George W. Shadoan, Washington, DC, for appellant.

Steven A. Hamilton, Washington, DC, for appellee.

Before TERRY and STEADMAN, Associate Judges, and TAYLOR, Associate Judge, Superior Court of the District of Columbia.*

TERRY, Associate Judge:

Edward Shomaker filed this medical malpractice action against George Washington University (GWU). In his complaint Mr. Shomaker alleged that two physicians at GWU's Medical Center had failed to diagnose and treat a malignant tumor in his leg.[1] A jury found GWU negligent and awarded appellant $350,000 for medical expenses, $737,500 for lost wages and home services, and nothing for pain and suffering. Mr. Shomaker filed a motion for a new trial on the issue of damages, which the court denied. Mr. Shomaker noted this appeal,[2] arguing that the verdict was inadequate and inconsistent in light of the jury's finding of liability. We affirm.

I

In February 1984 Mr. Shomaker injured himself in a sledding accident, and for several weeks thereafter he continued to feel pain in his right knee. On April 2, 1984, he consulted Dr. Samuel Wiesel, an orthopedic surgeon at GWU Medical Center. Dr. Wiesel determined that Mr. Shomaker had a torn hamstring muscle and recommended treatment with hot baths, anti-inflammatory drugs, and cortisone. Dr. Wiesel examined Mr. Shomaker several more times during 1984 and 1985 and once in January 1986.

In August 1986, after breaking his foot, Mr. Shomaker visited Dr. Robert Dow, another orthopedic surgeon. During the exam-

ination of his foot, Dr. Dow also examined Mr. Shomaker's hamstring because he was complaining of a chronic pull in the muscle of the inner and back part of the thigh. Dr. Dow recommended exercise and told Mr. Shomaker to return if he continued to experience difficulty.

Although the pain in Mr. Shomaker's leg was temporarily relieved by the anti-inflammatory drugs and exercise, it bothered him intermittently from 1984 to 1987. Prompted by the desire to know whether the pain was permanent or whether it might be alleviated by treatment, Mr. Shomaker went to see Dr. James Vailas, another orthopedic surgeon at GWU Medical Center, in October 1987. Dr. Vailas examined the area behind Mr. Shomaker's knee and felt an "irregular fibrous-type" tissue mass "with a smaller centralized ... fibrous nodule," about one centimeter by five centimeters. From his examination and the medical history provided by Mr. Shomaker, Dr. Vailas concluded that what he felt was scar tissue caused by a muscle tear. Dr. Vailas asked Mr. Shomaker to return one month later for further evaluation. He did so, and the doctor reexamined Mr. Shomaker's leg and found no changes.[3] Dr. Vailas and Mr. Shomaker discussed various treatment options, including surgical removal of the scar tissue. The doctor explained the potential risks associated with surgery and recommended that Mr. Shomaker watch for any symptomatic changes in the affected area.

In May 1990 Mr. Shomaker noticed that the back of his leg was painful, swollen, and warm to the touch. Unable to contact either Dr. Vailas or Dr. Wiesel, Mr. Shomaker called his primary physician, who referred him to another orthopedic surgeon, Dr. Philip Bobrow. When Dr. Bobrow examined Mr.

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1995).

1. The original complaint named as defendants Dr. Samuel W. Wiesel and Dr. James C. Vailas, the two GWU physicians, and Dr. Philip D. Bobrow, a Maryland physician. The action against Dr. Wiesel was dismissed with prejudice, and an amended complaint was filed substituting GWU as a defendant in lieu of Dr. Vailas. The action against Dr. Bobrow was stayed pending arbitration proceedings required by Maryland law, and

thereafter final judgment was entered in the trial court on the claim against him.

2. Mr. Shomaker died while the appeal was pending, and his wife, Michele Shomaker, was substituted as appellant in her capacity as personal representative of his estate.

3. Dr. Vailas testified that he was looking for an enlargement of the nodule or other changes in the skin, but found neither.

Shomaker's leg, he found a mass approximately four inches in diameter. He promptly ordered x-rays, which revealed a soft tissue mass. Dr. Bobrow prescribed an anti-inflammatory drug and recommended that Mr. Shomaker rest his leg for a while before increasing his activity level.[4]

By November 1990 the problem in Mr. Shomaker's leg had worsened. The mass had increased in size and was now pressing against his trouser leg. On December 17 he returned to Dr. Bobrow, who ordered a second x-ray. The x-ray showed a change in the mass, and Dr. Bobrow referred Mr. Shomaker to Dr. George Bogumill, an orthopedic surgeon at Georgetown University Medical Center. Dr. Bogumill performed a biopsy, which revealed that the mass in Mr. Shomaker's leg was a synovial sarcoma, a rare form of cancer. It was later discovered that the cancer had metastasized to Mr. Shomaker's lungs and spine.

Over the course of a seven-day trial in May 1993,[5] several expert witnesses on both sides presented conflicting evidence on the issues of causation and liability. Three experts for Mr. Shomaker, Dr. Marvin Romsdahl, Dr. Herbert Joseph, and Dr. William Brownlee,[6] testified that the applicable standard of care in 1987 required Dr. Vailas to do more than conduct a physical examination of the leg in order to rule out the possibility of malignancy. Dr. David Ettinger, an expert in medical oncology, testified that in his opinion the lesion present in Mr. Shomaker's leg in October 1987 was the same mass that was determined to be cancerous in 1990. According to Dr. Ettinger, if the proper diagnosis had been made in 1987, "the only thing that [would have been] needed at that particular time would have been surgical excision and post-op radiation therapy." He said that synovial sarcomas often grow rapidly, sometimes within a matter of weeks, and often metastasize just as rapidly. He opined that Mr. Shomaker's cancer had metastasized during the twelve to eighteen months preceding the December 1990 diagnosis and that early treatment would have offered Mr. Shomaker a better chance of recovery. Dr. Kevin Cullen, Mr. Shomaker's treating oncologist, also stated that the cancer had metastasized in late 1989 or early 1990. However, he admitted on cross-examination that it was possible that the cancer had metastasized as late as July 1990.

GWU presented expert testimony to the contrary. Dr. Michael Simon, an expert in orthopedic surgery with a specialty in orthopedic oncology, testified that given the size, depth, and characteristics of Mr. Shomaker's lesion in 1987, Dr. Vailas' conclusion that the mass was probably the result of an old muscle strain was based on sound judgment. According to Dr. Simon, the likelihood that a small superficial mass such as the one detected in Mr. Shomaker's leg in 1987 was cancerous was extremely remote—less than one in a thousand—and the standard of care in 1987 did not require a physician affirmatively to rule out such remote possibilities. In Dr. Simon's opinion, it was impossible to determine whether the "irregular fibrous-type" tissue noted by Dr. Vailas in 1987 was the same mass found by Dr. Bobrow in 1990. Dr. Edward Rankin, an expert in orthopedic surgery and soft tissue lesions, testified that in his opinion the sarcoma that was diagnosed in 1990 was not the same mass felt in Mr. Shomaker's leg in 1987.

To establish pain and suffering, Mr. Shomaker and his oncologist, Dr. Cullen, testified that in addition to radiation and chemotherapy treatments which required him to give himself injections in the thighs and abdomen each day, Mr. Shomaker was hospital-

---

4. Shortly after this visit to Dr. Bobrow, Mr. Shomaker left the country for a three-week trip to the Soviet Union. Evidence of this trip and of Mr. Shomaker's possible exposure to radiation during this and other trips to nuclear reactor sites in the Soviet Union, including Chernobyl, was excluded at trial.

5. At the time of trial Mr. Shomaker was forty-five years old.

6. Dr. Romsdahl, a surgeon at Anderson Cancer Hospital in Houston, Texas, was qualified as an expert in the diagnosis and treatment of soft-tissue sarcomas. Dr. Joseph, a practicing orthopedist in Rockville, Maryland, was qualified as an expert in the field of orthopedic surgery. Dr. Brownlee, a general surgeon and former medical examiner in the District of Columbia, was qualified as an expert in the management of soft-tissue sarcomas.

ized several times because of complications. On one such occasion a lung biopsy caused Mr. Shomaker's lung to collapse, requiring a chest tube to be inserted to re-expand his lung, a procedure that both Dr. Cullen and Mr. Shomaker described as "very painful." On another occasion Mr. Shomaker was hospitalized when one of the tumors in his chest began to bleed, causing his chest to fill up with blood. Mr. Shomaker also testified that by November 1, 1992, he had started taking morphine orally in an effort to control the pain and that the steroids he took to reduce the spinal swelling caused him to experience psychotic episodes. Despite his continued medical treatment, however, Mr. Shomaker continued to work until October 1992.

GWU vigorously disputed Mr. Shomaker's contention that Dr. Vailas' 1987 diagnosis of Mr. Shomaker's medical problem was the proximate cause of his pain and suffering. In addition to contesting the assertion that the standard of care had been breached, GWU offered evidence that the mass in Mr. Shomaker's leg in 1987 was not the same mass that was diagnosed as cancerous in 1990. Significantly for this appeal, GWU also offered evidence tending to show that Mr. Shomaker would have had similar symptoms and undergone similar treatment regardless of whether the mass had been removed in 1987. On cross-examination Dr. Ramsdahl, Dr. Cullen, and Dr. Ettinger all testified that the chance of a synovial sarcoma's recurring and metastasizing is approximately twenty to forty percent, and that when it does recur, the fatality rate is very high.

It was stipulated that Mr. Shomaker's medical expenses totaled $364,147.22, and by agreement this amount was reduced to $350,000.00, which represented the costs for surgical removal of the tumor and post-operative radiation therapy. Thus the total amount of damages sought for medical expenses was $350,000.00. An economist, Thomas Borzilleri, calculated Mr. Shomaker's economic loss at $1,932,123.00. The jury returned a verdict in favor of Mr. Shomaker, finding that GWU had breached the recognized standard of care, that this breach was the proximate cause of his injuries, and that Mr. Shomaker

was not contributorily negligent. He was awarded $350,000 for his medical expenses and $737,500 for lost income. No award was given for pain and suffering.

Mr. Shomaker moved for a new trial limited to the issue of damages. The court denied the motion, stating that "the issues were sufficiently contested as to liability and causation that there would have been a basis for the jury to conclude that the pain and suffering should not be ascribed to defendant's conduct." Ten days after the court ruled, this court issued its opinion in *Bernard v. Calkins,* 624 A.2d 1217 (D.C.1993). In light of that decision, Mr. Shomaker moved for reconsideration of the denial of his motion for new trial. The court did reconsider its ruling, but having done so, it ruled that the damages awarded were not inadequate and once again denied the motion, explaining its reasons in a six-page order.

## II

 A ruling on a motion for new trial is committed to the sound discretion of the trial court, and is reviewable only for an abuse of discretion. *See, e.g., Oxendine v. Merrell Dow Pharmaceuticals, Inc.,* 506 A.2d 1100, 1110 (D.C.1986); *Barron v. District of Columbia,* 494 A.2d 663, 665 (D.C.1985); *Rich v. District of Columbia,* 410 A.2d 528, 535 (D.C.1979). When the trial court refuses to grant a new trial on the issue of damages alone, we will reverse that ruling and order a new trial "only when the award is so inadequate as to indicate prejudice, passion, or partiality on the part of the jury, or where it must have been based on oversight, mistake, or consideration of an improper element," *Hughes v. Pender,* 391 A.2d 259, 263 (D.C. 1978) (citations omitted), or when the award is "contrary to all reason...." *Taylor v. Washington Terminal Co.,* 133 U.S.App.D.C. 110, 113, 409 F.2d 145, 148, *cert. denied,* 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969); *accord, e.g., Jefferson v. Ourisman Chevrolet Co.,* 615 A.2d 582, 585–586 (D.C.1992); *Romer v. District of Columbia,* 449 A.2d 1097, 1099 (D.C.1982) (citing *Hughes* and *Taylor*). Under this standard, "the circumstances are necessarily rare when the trial court's decision upholding the jury verdict will be re-

versed." *Bernard v. Calkins, supra*, 624 A.2d at 1220.

■ Appellant argues that the jury award was inadequate and inconsistent in light of the record which, she maintains, clearly established pain and suffering and a higher amount of economic damages. Relying on our decisions in *Barron v. District of Columbia* and *Bernard v. Calkins*, appellant argues that once the jury found GWU negligent, there was no question of liability, and a new trial should therefore have been ordered. We do not agree.

In *Barron v. District of Columbia* the plaintiff suffered serious injuries when she rode her bicycle into a torn-up section of an alley and fell off the bicycle. The uncontroverted evidence established that the District of Columbia was negligent and that, as a result of the fall, the plaintiff suffered considerable pain and suffering as well as permanent facial scarring. The jury, however, awarded an amount only $38.50 more the undisputed special damages. The plaintiff moved for a new trial on damages only, arguing that the award "was so inadequate as to indicate that it was the product of prejudice, partiality, or passion, or that it was based on mistake, oversight, or consideration of an improper element." 494 A.2d at 664. We agreed and ordered a new trial, stating that the award was "suspect," since there was no real question as to liability and no "rational explanation for [the] jury's refusal to award any but nominal recovery above the undisputed special damages...." *Id.* at 665.

We likewise questioned the adequacy of the jury award in *Bernard v. Calkins, supra.* In that case the plaintiff was struck by an automobile and dragged for some distance before his foot was run over as he tried to get out of the way. He suffered, among other things, a fractured ankle and ligament damage which required surgery and left him with a permanent impairment and recurring pain. The jury found the defendant liable but failed to award the plaintiff any compensation for lost earnings or pain and suffering.

We reversed and ordered a new trial on the issue of damages, stating that the jury "was required to award damages in a sum which would fairly and reasonably compensate appellant for all the damages he suffered which were proximately caused by appellee's negligence." 624 A.2d at 1220 (citations omitted). We concluded that "the jury's omission of any compensation for lost earnings and pain and suffering ... [was] not only suspect, but result[ed] from a mistake or consideration of some improper element, thereby warranting a new trial on damages." *Id.* at 1221–1222 (citing *Barron, supra* ).

Contrary to appellant's argument, *Barron* and *Bernard* are distinguishable from the case at bar, since in each of those cases it was undisputed that the plaintiff's medical treatment and pain and suffering were directly caused by the negligence of the defendant. *See Prins–Stairs v. Anden Group*, 655 A.2d 842, 843–844 & n. 4 (D.C.1995) (distinguishing *Barron* as "an exceptional case" and *Bernard* as "one of the 'necessarily rare' cases"). By contrast, in the instant case, although the jury found that the conduct of GWU's physicians was the proximate cause of Mr. Shomaker's *injuries* (as it indicated on the verdict form), whether that conduct was the proximate cause of Mr. Shomaker's *medical treatment and resulting pain and suffering* was a hotly disputed issue.[7] Dr. Simon, one of GWU's expert witnesses, testified that the chances were less than one in a thousand that the mass detected in Mr. Shomaker's leg in 1987 was cancerous, and that the applicable standard of care did not require an examining doctor to rule out such a remote possibility of malignancy. Dr. Cullen, Mr. Shomaker's oncologist, admitted on cross-examination that he could not rule out the possibility that the cancer had metastasized as late as July 1990, almost three years after Mr. Shomaker's last examination by any GWU physician. Furthermore, testimony from GWU's witnesses, as well as Mr. Shomaker's witnesses on cross-examination, established that this particular type of cancer has a twenty to forty percent chance of re-

---

7. In the trial court, GWU did not seriously challenge the award of $350,000 for medical treatment, and it has not noted a cross-appeal. Thus we are not presented with any issue regarding the correctness of that award.

currence as well as a high fatality rate. If the jury credited this testimony, it could reasonably have found that Mr. Shomaker's pain and suffering were inevitable, and therefore not proximately caused by GWU's conduct. As the trial court explained in its order denying the motion for new trial:

> [T]he jury could have concluded that pain, regardless of defendant's malpractice, would have been suffered with any medical procedures involved in detecting malignancy in the lesion in 1987 or later, with any treatment related to the lesion when found to be malignant, and with the cancer itself and its possible recurrence.... [T]he record is such that reasonable jurors could have concluded that plaintiff *suffered no more pain than he would have in any event, even without malpractice,* and therefore the jury awarded no *extra* damages on this point. Clearly, the total award of over one million dollars for a case in which the jury could have just as easily credited the testimony of the defendant's experts cannot be considered an inadequate award. [Footnote omitted; emphasis added.]

In this respect, the case before us is more like *Jefferson v. Ourisman Chevrolet Co., supra,* in which we upheld the trial court's decision to deny a new trial on damages after the jury awarded the plaintiffs no damages for medical expenses, lost wages, or pain and suffering. In *Jefferson* the parties vigorously contested the issue of whether the medical treatment received by the injured plaintiff was proximately caused by the defendant's conduct. In view of the conflicting testimony, we held that it was "within the province of the jury not to award the appellants any damages." 615 A.2d at 586 (citation and internal quotation marks omitted). We agreed with the trial court's statement that "[t]he fact that Mr. Jefferson obtained [medical] treatment [did] not necessarily establish the fact that he needed the treatment as a result of the collision at issue in this case." *Id.* at 583. Similarly, in the case at bar, we agree with the trial court that it was well within the jury's power to find that GWU's negligence was not the proximate cause of the pain and suffering that resulted from Mr. Shomaker's medical treatment. After all, there was (according to the evidence) a twenty to forty percent chance that the cancer, even it if it had been detected and removed in 1987, would have recurred, and thus Mr. Shomaker would have had to undergo the same treatment regardless of any negligence in 1987 attributable to GWU's doctors. Given the conflicting testimony, the jury could reasonably find that Mr. Shomaker's pain and suffering were inevitable and that an award of damages specifically for pain and suffering was therefore unwarranted. Thus we conclude that there was a rational basis for the jury's award of damages for medical expenses and lost wages, but not for pain and suffering. As the trial court said in its order, the $737,500 in economic damages "could reasonably be correlated with the testimony reflecting a 40% reoccurrence rate and a high fatality rate."

 We also reject appellant's argument that the jury based its damage award on an impermissible factor—media attention to the economic impact of medical malpractice verdicts. At least two television broadcasts and a newspaper article published during the trial quoted various individuals as saying that medical malpractice awards were driving up the nation's health care costs. Appellant relies on the fact that one of the jurors admitted having read several articles on this subject, both before and during trial. We find this argument meritless for two reasons. First, the trial court followed the two-step procedure set forth in *Morris v. United States,* 564 A.2d 746, 748 (D.C.1989), and determined that the juror in question was not prejudiced by the media attention to malpractice awards.[8] We can discern no flaw either in that decision or in the manner in which the court reached it. Second, this particular juror was not in attendance on the final day of jury deliberations and did not participate in the verdict[9]—a fact that renders appellant's argument close to frivolous.

---

**8.** *Morris* requires the trial court to determine whether the information itself was "potentially prejudicial" and, if so, whether it actually prejudiced the juror's verdict. 564 A.2d at 748.

**9.** The court conducted a voir dire of Juror No.

Finding nothing in the record to indicate that the jury's award was based on prejudice, passion, or partiality or on an oversight, mistake, or consideration of an improper element, or that it was contrary to all reason, we hold that the trial court did not abuse its discretion in denying Mr. Shomaker's motion for new trial. *Jefferson, supra,* 615 A.2d at 586. Accordingly, the judgment is

*Affirmed.*

581 on a Friday afternoon, after the jury had been deliberating for approximately two days. The juror said that he was aware of the recent publicity, but that it would not influence his decision. The following Monday morning, the same juror called in sick, and with the consent of both parties the remaining jurors continued to deliberate in his absence. The verdict was returned later that day.