Dorothy Y. DOUGLAS, Appellant,

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Appellee.**

**No. 97–CV–1115.**

District of Columbia Court of Appeals.

Argued March 16, 1999.

Decided Aug. 10, 2000.

---

Donald A. Clower, for appellant.

Douglas L. Johnson, with whom Robert L. Polk and Robert J. Kniaz, were on the brief, for appellee.

Before WAGNER, Chief Judge, TERRY, Associate Judge, and KING, Senior Judge.

TERRY, Associate Judge:

This negligence action arises from a collision between two buses owned and operated by the Washington Metropolitan Area Transit Authority ("WMATA"). Appellant Dorothy Douglas, a passenger on one of the buses, claimed that the accident caused her to develop cervical disc syndrome in her neck,[1] which eventually required surgery. She filed suit against WMATA in the Superior Court, seeking $500,000 in

---

1. Cervical disc syndrome is a condition that results when a damaged or herniated disc pinches the nerve going from the neck to the shoulder.

compensatory damages for medical expenses and pain and suffering, plus costs and interest. The jury found in her favor, but awarded her only $1,461.57 in damages. On appeal, Ms. Douglas challenges the trial court's denial of her pre-trial motion *in limine*, which sought to exclude evidence of prior injuries, and her post-trial motion for a new trial on damages. Finding no error, we affirm.

## I

### A. *Factual Background*

On June 5, 1992, a WMATA bus in which Ms. Douglas was a passenger was making a left turn out of a parking lot on Minnesota Avenue, N.E., when it was hit from behind by another WMATA bus. The impact caused Ms. Douglas to be jerked forward and backward and threw her three-year-old son completely out of his seat. Ms. Douglas testified that it got "black all of a sudden" and that immediately after the accident she felt pain "shooting all up [her] neck. . . ."[2]

Ms. Douglas was placed in a neck brace and taken by ambulance to Greater Southeast Community Hospital. After an initial examination, she was diagnosed with an acute cervical strain and an acute right shoulder strain. Ms. Douglas was subsequently treated by Dr. Christopher Magee, an orthopedic surgeon, who in turn referred her to Dr. Herbert Joseph for further treatment, including physical therapy. In September 1992 Dr. Magee released Ms. Douglas from his care. Although she was still complaining of pain and stiffness in her neck[3] and tingling and numbness in her hand, Dr. Magee concluded that Ms. Douglas "appear[ed] to have reached maxi-

mum medical improvement with regard to her neck injury."

But the pain and stiffness in Ms. Douglas' neck did not go away. By February 1993 it had become so severe that she was having difficulty sleeping. In search of relief, she went to see Dr. Rida Azer, another orthopedic surgeon. Dr. Azer detected tenderness over the fifth, sixth, and seventh vertebrae in Ms. Douglas' neck, noted that she had a limited range of motion in her neck, and observed that she was experiencing muscle spasms. He diagnosed her condition as cervical disc syndrome with associated shoulder pain. After a second course of physical therapy failed to bring any improvement, Dr. Azer referred Ms. Douglas to a neurosurgeon, Dr. Earl Mills, who recommended that Ms. Douglas undergo a discectomy to remove two of the discs in her neck.[4]

On December 8, 1994, Dr. Mills operated on Ms. Douglas' neck, while Dr. Azer removed pieces of bone from her hip and used them to replace the now-missing discs. Ms. Douglas remained under sedation for three to four days following the surgery and could not leave the hospital until a few days before Christmas. After her release, she was confined to bed at home for more than four months, had to wear a metal brace around her neck until the bones knit, and was unable to bathe herself or perform basic housekeeping and child-rearing tasks. From late December 1994 through April 1995 she had to hire a private care service for assistance in her home. She underwent extensive physical therapy and even had to relearn how to walk. Dr. Azer testified that Ms. Douglas would be permanently restricted from engaging in certain activities because three

---

**2.** Ms. Douglas also claimed to have injured her knees and wrist in the accident, but chose not to seek compensation for those injuries because she could not prove they were the result of the bus accident, rather than a pre-existing condition.

**3.** Dr. Magee's report stated that Ms. Douglas was still complaining of intermittent neck

pain and occasional low back pain, with tenderness "over the right and left paracervical musculature on both sides with pain on range of motion of the cervical spine."

**4.** Dr. Azer testified that Ms. Douglas risked permanent nerve damage and paralysis if her condition were not surgically corrected.

of her vertebrae had been fused together during the surgery.

## B. *The Motion in Limine*

Before trial, Ms. Douglas filed a motion *in limine* asking the trial court to bar the admission of evidence "concerning all prior claims of injury unrelated to [her] cervical spine or neck," as well as any prior disability or workers' compensation claims. She argued that evidence of prior injuries to other parts of her body was irrelevant to the issue of whether the injuries to her neck and cervical spine were proximately caused by the bus accident, and that evidence of prior claims should not be used to impeach her credibility unless WMATA could show that the prior claims were fraudulent. In response, WMATA argued that evidence of prior injuries to Ms. Douglas' neck would be relevant to the issue of whether, and to what extent, the injuries for which she received medical treatment after September 1992, including the surgery, were proximately caused by the bus accident. The court denied Ms. Douglas' motion, but indicated that it would be willing to fashion a cautionary instruction to make sure that any evidence of Ms. Douglas' prior injuries would not be used by the jury for an improper purpose.

## C. *Evidence of Prior Injuries*

During the trial, counsel for WMATA inquired about several prior injuries to Ms. Douglas' neck. First, Ms. Douglas said she was involved in an automobile accident on March 10, 1972, but could not remember whether it caused whiplash and a neck injury. Then, on July 15, 1975, Ms. Douglas injured her neck and right shoulder when a heavy wooden chair fell on her at work. That injury prevented her from working for approximately three months following the accident, and again from early April to mid-December of 1976. Over objection, counsel for WMATA asked Ms. Douglas whether she testified at a work-

ers' compensation hearing in 1980 that this same neck injury was also responsible for her absence from work between June 8 and October 18, 1978. Ms. Douglas said she did not recall the hearing, but records from a medical examination conducted on June 24, 1981, revealed that she was still complaining of lingering wrist, lower back, and neck pain traceable to the 1975 accident.

WMATA's attorney next asked Ms. Douglas whether she remembered receiving treatment for back and neck injuries after being hit by a falling shoe rack on May 28, 1979. Ms. Douglas again stated that she did not recall the incident, but Dr. Azer testified that on July 26, 1979, he diagnosed Ms. Douglas with a cervical strain in her neck which she attributed to an injury sustained in May.

On September 24, 1984, Ms. Douglas slipped on a flight of stairs at work, injuring her legs, neck, and back. She testified that she received medical treatment for neck injuries following that fall, but was unable to remember whether it caused her to miss any time from work. On March 16, 1986, while working for the District of Columbia Department of Corrections, Ms. Douglas injured her neck again when she was pushed into an iron door.[5]

The final injury to Ms. Douglas' neck prior to the bus accident occurred in· October 1990, when a woman fell on top of her during a fight at a Department of Corrections facility, injuring Ms. Douglas' knee as well as her neck. Ms. Douglas underwent surgery to repair the damage to her knee, but stated at trial that it had not yet fully healed. She was also treated by a general surgeon, Dr. Yousef Akbari, for cervical strain in her neck with radiation down the right shoulder in connection with the 1990 incident. Ms. Douglas said that the injury to her neck persisted for a while, "but not long, and then it was over. It went away."

---

**5.** In response to questions about these last two incidents, Ms. Douglas volunteered information about additional injuries to her left shoulder and knees. Counsel for WMATA did not ask any follow-up questions about these injuries.

She insisted that she was no longer experiencing any symptoms associated with the neck injury by the time of the bus accident, and remarked that she had been cleared by her doctor. On cross-examination, however, Ms. Douglas admitted that she was still complaining to Dr. Azer about lingering neck pain during a physical examination as late as April 1992, two months before the bus accident, even though the doctor could find no objective evidence of any neck injury at that time. Dr. Azer's report of that April examination concluded with the notation, "Neurovascular status about the neck, shoulder, and upper extremities [is] completely within normal limits."

### D. *Evidence of Causation*

Dr. Azer testified that a cervical strain, like a sprained ankle, involves damage and overstretching of the muscles and ligaments from straining, whereas cervical disc syndrome results when a disc has slipped, ruptured, or bulged out, causing a pinched nerve. According to Dr. Azer, the usual causes of cervical disc syndrome are acute injury, straining, and trauma, acute injury being by far the most common cause. The doctor stated his opinion, to a reasonable degree of medical certainty, that it was the bus accident of June 5, 1992, rather than any pre-existing condition, which caused Ms. Douglas to develop cervical disc syndrome.

Dr. Azer conceded that Ms. Douglas' history of accidents and neck injuries, dating back to 1972, could "possibly" have made her more predisposed or susceptible to developing the condition for which she had surgery, but he emphasized that she was not diagnosed with cervical disc syndrome until after the June 1992 bus accident. "[W]hat she had before," he said, "was never proven." On cross-examination, however, Dr. Azer acknowledged that the description of Ms. Douglas' symptoms contained in Dr. Akbari's report of his examination following the workplace accident in October 1990 was consistent with radicular pain caused by a pinched nerve.

Dr. Azer's medical opinion was directly contradicted by that of Dr. Robert Gordon, an orthopedic surgeon testifying on behalf of WMATA. Dr. Gordon conducted an independent medical examination of Ms. Douglas on May 12, 1994, several months prior to her surgery. He stated that while Ms. Douglas expressed discomfort when her neck was moved and reported diminished sensation in the skin of her right arm, he could find "no objective evidence of any residual [symptoms] from the cervical muscle strain." According to Dr. Gordon, all of Ms. Douglas' problems that might have been caused by the bus accident had abated by May 12, 1994, and there was no need for any further treatment or surgery at that time.

On August 28, 1995, Dr. Gordon examined Ms. Douglas once again. She informed him that she had had surgery on her neck and right knee since she had last seen him, but that neither procedure had alleviated her symptoms. Dr. Gordon recalled that in May 1994 Ms. Douglas had told him that an operation to correct carpal tunnel syndrome in her right wrist had been similarly ineffective. During the August 1995 examination, Ms. Douglas again complained of symptoms for which Dr. Gordon could find no objective medical cause. He concluded that the inconsistencies between Ms. Douglas' subjective complaints and the objective medical evidence indicated that her complaints were "on a non-physical basis."

In addition to the two physical examinations, Dr. Gordon reviewed Ms. Douglas' medical records, including the results of a magnetic resonance imaging (MRI) test. On the basis of her medical history, Dr. Gordon opined that the condition of the discs in Ms. Douglas' neck was no worse than would be expected as a result of normal deterioration from "wear and tear" over the years. He found no evidence of the type of damage which would be caused by a single traumatic event, or of any condition which would produce the symp-

toms of which Ms. Douglas complained. Dr. Gordon also testified that while the doctor who examined Ms. Douglas on April 28, 1992 (Dr. Joseph) concluded that she had no neck or upper extremity problems, the report of that examination noted that Ms. Douglas had voiced "significant complaints" about her neck at the time. Ms. Douglas "said she had difficulty [with her neck and upper extremities], but [Dr. Joseph] didn't find any anatomical basis for it."

In Dr. Gordon's opinion, the bus accident caused, at most, a cervical muscle strain, for which the normal course of treatment would be rest, heat, physical therapy, and possibly medication for about six weeks. He said that he would not have recommended surgery for Ms. Douglas because her symptoms were unrelated to any objective medical evidence.

### E. *The Verdict and the Motion for New Trial*

The jury found in Ms. Douglas' favor but awarded her only $1,461.57 in damages, an amount exactly equal to the sum of the cost of the ambulance ride to the hospital ($162.00), the emergency room bill ($664.57), the emergency room physician's bill ($145.00), and the bill for Dr. Magee's three examinations of Ms. Douglas through September 18, 1992 ($490.00).

Ms. Douglas filed a motion under Super. Ct. Civ. R. 59(a) for a new trial on the issue of damages, arguing that the jury had improperly failed to award her any damages for pain and suffering, and that its finding that Ms. Douglas' medical treatment after September 1992 was not proximately related to the bus accident was against the weight of the evidence. The court denied the motion without a hearing.

## II

Ms. Douglas makes three arguments on appeal. First, she contends that the trial court erred in denying her motion *in limine* to exclude any evidence of prior injuries to areas other than her neck, and that

she was prejudiced by this evidence because it led the jury to believe that she was claims-minded. Second, Ms. Douglas maintains that the court erred in denying her motion for a new trial because, although the jury found that she suffered an injury which necessitated medical treatment as a proximate result of WMATA's negligence, it did not award her any damages for pain and suffering. Finally, Ms. Douglas argues that the jury's finding that no medical treatment after September 18, 1992, was proximately caused by the bus accident was against the weight of the evidence. We address each of these arguments in turn.

### A. *The Motion in Limine*

■ Ms. Douglas claims that the trial court erred in denying her motion *in limine* to exclude evidence of prior injuries unrelated to her neck and shoulder, and that evidence of such prior injuries was improperly used by WMATA. This argument is unsupported by the record. Contrary to Ms. Douglas' assertion, there was very little evidence of *unrelated* injuries introduced at all. Most of the evidence of prior injuries that was heard by the jury focused on the series of injuries Ms. Douglas had sustained to her neck and shoulder area. This evidence was clearly relevant to the issue of whether Ms. Douglas' injuries, pain, and medical treatment were caused by the bus accident in June 1992, or whether they resulted from the various other injuries she had suffered in previous years. Indeed, causation was the only substantially contested issue in the trial.

As WMATA points out in its brief, most of the evidence of unrelated injuries that the jury actually heard at trial came in during direct or redirect examination of Ms. Douglas by her own counsel. While there were a few occasions when the evidence elicited by WMATA's counsel on cross-examination pertained only to an injury or claim involving Ms. Douglas' knee, rather than her neck or shoulder, the context in which these questions were asked,

as well as the manner in which WMATA's counsel reacted to Ms. Douglas' disclosures, satisfies us that counsel's intent was only to probe for further evidence of the extent and severity of Ms. Douglas' prior neck trauma, not to elicit information about unrelated injuries.[6] For this reason, the cases cited by Ms. Douglas, which discuss the need for a factual predicate before evidence of prior claims can be used to show claims-mindedness,[7] are inapposite. We note also that the minimal prejudice which Ms. Douglas might have suffered from the evidence of unrelated injuries could have been cured had she chosen to accept the trial court's offer to give a limiting instruction.

### B. *The Motion for New Trial*

Ms. Douglas next contends that the trial court erred in refusing to set aside the verdict and order a new trial because the jury did not find that the treatment she received after September 1992, including her surgery, was proximately caused by WMATA's negligence and did not award her any damages for pain and suffering.

▆ We review the trial court's denial of a motion for a new trial on damages for an abuse of discretion, *see, e.g., Jefferson v. Ourisman Chevrolet Co.*, 615 A.2d 582, 585 (D.C.1992); *Bernard v. Calkins*, 624 A.2d 1217, 1219 (D.C.1993), and will reverse only when the jury award "is so inadequate as to indicate prejudice, passion, or partiality on the part of the jury, or where it must have been based on oversight, mistake or consideration of an improper element." *Hughes v. Pender*, 391 A.2d 259, 263 (D.C.1978); *accord, e.g., Bernard*, 624 A.2d at 1219–1220; *Romer v. District of Columbia*, 449 A.2d 1097, 1099 (D.C.1982). "[T]he circumstances are necessarily rare when the trial court's decision upholding the jury verdict will be reversed." *Bernard*, 624 A.2d at 1220; *see also Taylor v. Washington Terminal Co.*, 133 U.S.App. D.C. 110, 113, 409 F.2d 145, 148, *cert. denied*, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969).

### 1. *Proximate Cause*

WMATA's theory at trial was that the bus accident in June 1992 caused, at most, a cervical muscle strain, and was not the cause of the cervical disc syndrome, or herniation, for which Ms. Douglas required surgery in December 1994. WMATA presented evidence that Ms. Douglas' long history of injuries to her neck prior to the bus accident was more likely the cause of her development of cervical disc syndrome.[8]

In *Prins–Stairs v. Anden Group*, 655 A.2d 842 (D.C.1995), the jury failed to award any damages to a plaintiff who claimed that she suffered a cervical strain and required surgery for a herniated disc as a result of an automobile accident.

---

6. For example, when WMATA's counsel asked Ms. Douglas why she applied for handicapped license plates for her automobile in December 1991, she explained that she was having difficulty walking after her knee surgery. Later, when WMATA's attorney inquired why Ms. Douglas took disability retirement from her job at the Department of Corrections, she stated that this also was due to the condition of her knee after the work-related incident in October 1990. At another point in the cross-examination, counsel for WMATA asked Ms. Douglas whether Dr. Azer had told her in 1993 that she had certain permanent limitations as a result of that same incident. Ms. Douglas answered affirmatively, but later explained that the restrictions were because of the injury to her knee, rather than the injury to her neck. On each of these occasions, WMATA's attorney promptly abandoned his line of questioning as soon as it became apparent that it would not elicit any evidence of prior neck injuries.

7. *E.g., Murphy v. Bonanno*, 663 A.2d 505, 509–510 (D.C.1995). Ms. Douglas also cites *Smalls v. WMATA*, 309 U.S.App.D.C. 34, 38 F.3d 609 (1994). But there is no published opinion in *Smalls* (the citation is to a table of "decisions without opinions"), and thus *Smalls* has no precedential value.

8. In the alternative, WMATA offered evidence, through the testimony of Dr. Gordon, that Ms. Douglas never even developed cervical disc syndrome at all.

There was evidence which supported the defense theory that the plaintiff's neck condition was not proximately caused by the accident but rather stemmed from "repeated prior incidents" after which she reported cervical pain. *Id.* at 842–843. "Viewing the evidence in its totality, and with due regard for the jury's prerogative to assess the credibility of witnesses, [this court was] satisfied that the jury reasonably could have found that [the plaintiff] suffered no injury from the [accident] that could be differentiated from" the condition about which she had previously complained. *Id.*

■ The instant case, in our view, is materially indistinguishable from *Prins–Stairs.* The evidence presented by WMATA supports a finding that the bus accident was not the proximate cause of any of the medical conditions for which Ms. Douglas received treatment after September 1992, when Dr. Magee concluded that she had reached "maximum medical improvement" and discharged her from his care. Certainly there was other evidence which might have supported a different verdict, but it is not this court's function to reweigh the evidence or to substitute its judgment for that of the jury and the trial court. Ms. Douglas implicitly concedes that the evidence introduced at trial supports the jury's verdict when she states in her brief, "It is apparent that the jury adopted Dr. Gordon's opinion and concluded that plaintiff sustained only a cervical strain and that the ambulance, emergency room treatment, and Dr. Magee's treatment [were] necessary and reasonable and [were] proximately caused by the defendant's negligence." Thus she is reduced to arguing that the verdict should be set aside because the jury credited Dr. Gordon instead of Dr. Azer. Even if we agreed with her assessment of the relative credi-

bility of these two experts, we could not accept such an argument.

Because the verdict in this case was by no means "contrary to all reason," *see, e.g., Romer,* 449 A.2d at 1099, we hold that the trial court committed no error by letting it stand.

### 2. *Pain and Suffering*

Ms. Douglas also finds fault with the jury's failure to award any damages for pain and suffering. She notes that the jury's award reflects the exact amount of the medical expenses incurred from June through September 1992, without any additional damages for pain and suffering. Because the jury's verdict necessarily reflects a finding that the negligence of WMATA proximately caused injuries which required medical treatment through September 1992, she maintains that the jury's concomitant failure to award even nominal damages for pain and suffering demonstrates that it failed to follow the trial court's instructions, and as a result returned a verdict with no principled basis.[9]

Ms. Douglas relies primarily on our decision in *Bernard v. Calkins, supra,* in which we held that once the jury resolved the question of liability in favor of the plaintiff, it "was required to award damages in a sum which would fairly and reasonably compensate [the plaintiff] for all the damages he suffered which were proximately caused by appellee's negligence." 624 A.2d at 1220 (citations omitted). The parties stipulated to the amount of medical expenses and lost wages, and "[m]edical experts for both parties agreed that [the plaintiff] suffered a permanent overall bodily impairment as a result of the accident...." *Id.* at 1221. It was "undisputed that [the plaintiff] sustained a fracture to his ankle as a result of [the] accident which required his initial

9. Ms. Douglas does not challenge the instructions given by the trial court, which, she concedes, included an instruction on damages for pain and suffering. Rather, she contends that the jury either "misunderstood, mistook, or completely ignored the judge's instructions ... [or] was acting with an improper purpose, that being to punish Ms. Douglas for bringing this claim after a long history of prior claims...."

hospitalization and surgery, a cast, a brace and a period of recuperation." *Id.* Thus we recognized that "objective evidence of some pain [was] apparent from the injury and surgery as described in the record." *Id.* Nevertheless, the jury awarded damages in a sum less than the medical expenses, even though its foreperson stated in open court that the award was for "100 percent medical expenses [but] no lost wages." *Id.* at 1219. Since it was evident from the record, which included a verdict form, that "the jury omitted elements of damages which the undisputed evidence, including the parties' stipulation, demonstrated," we concluded that the jury's verdict resulted from mistake or consideration of an improper element, and reversed for a new trial on damages. *Id.* at 1221–1222.

Similarly, in *Barron v. District of Columbia,* 494 A.2d 663 (D.C.1985), "the evidence [was] uncontradicted and unimpeached that the plaintiff suffered substantial injuries, including significant permanent facial scarring, and ... there [was] no meaningful contest on the issue of liability...." *Id.* at 665. Nevertheless, the jury awarded a mere $38.50 in addition to the undisputed special damages. In those circumstances, we held that there was " 'no principled basis' upon which to affirm the decision...." *Bernard,* 624 A.2d at 1220 (quoting *Barron,* 494 A.2d at 665). Both *Barron* and *Bernard* relied on the following quoted passage from *Brown v. Richard H. Wacholz, Inc.,* 467 F.2d 18 (10th Cir.1972):

> In the present case the verdict reflects the exact amount of medical and hospital outlay. Thus, on its face it establishes that the jury failed and refused to award compensation for pain and suffering and permanent disability. Where, as here, the plaintiff suffered a severe injury in which the damages were substantial, the conclusion must be that the jury disregarded its fact-finding function. It is clear from the authorities that the jury has no such dispensing power. Where

> this is apparent the failure of the trial judge to grant a new trial constitutes a manifest abuse of discretion.

*Id.* at 21 (quoted in *Bernard,* 624 A.2d at 1220, and in *Barron,* 494 A.2d at 665).

The case at bar is distinguishable from *Bernard, Barron,* and *Brown* because in each of those cases the jury found that the plaintiff's severe injuries were proximately caused by the defendant's negligence, whereas the jury in the instant case apparently rejected Ms. Douglas' assertion that the bus accident caused her to develop cervical disc syndrome. As Ms. Douglas acknowledges in her brief, "the jury's verdict appears to have incorporated Dr. Gordon's opinion and totally discounted the evidence [that she] presented." But that is exactly what a jury is entitled to do if it finds a defense witness, such as Dr. Gordon, credible. On the basis of Dr. Gordon's testimony, the jury could rationally find that while the medical treatment Ms. Douglas received in the months immediately following the accident may have been made necessary (and thus proximately caused) by WMATA's negligence, any pain that she experienced during that time was the inevitable result of her prior injuries and could not be ascribed to the bus accident.

In this respect the instant case is like *Shomaker v. George Washington University,* 669 A.2d 1291 (D.C.1995). In *Shomaker* the jury found that doctors at the university's medical center had negligently failed to diagnose and treat a malignant tumor in the plaintiff's leg, that their negligence had proximately caused the plaintiff's injuries, and that the plaintiff was entitled to $350,000 for medical expenses and $737,500 for lost wages and home services, but nothing for pain and suffering. In affirming the trial court's denial of a motion for a new trial on damages, we distinguished *Barron* and *Bernard* on the ground that "in each of those cases it was undisputed that the plaintiff's medical treatment and pain and suffering were directly caused by the negligence of the

defendant,"∘ whereas in *Shomaker,* "although the jury found that the conduct of GWU's physicians was the proximate cause of Mr. Shomaker's *injuries ...* whether that conduct was the proximate cause of Mr. Shomaker's *medical treatment and resulting pain and suffering* was a hotly disputed issue." *Id.* at 1295 (emphasis in original). The trial court ruled, and we upheld its ruling, "that reasonable jurors could have concluded that plaintiff *suffered no more pain than he would have in any event,"* even in the absence of negligence. *Id.* at 1296 (emphasis in original).

■■■ *Shomaker* stands for the proposition that when proximate cause as to both medical treatment and pain and suffering is contested, the evidence may warrant the denial of damages for pain and suffering. That determination is well within the jury's province. *See id.* at 1296. More recently, in *Posner v. Holmes,* 739 A.2d 358 (D.C.1999), we affirmed the denial of a motion for new trial on damages because "there was evidence from which the jury could reasonably find that some of [the plaintiff's] injuries were not proximately caused by the accident...." *Id.* at 364; *accord, Jefferson v. Ourisman Chevrolet Co.,* 615 A.2d at 585–586; *see also Hawthorne v. Canavan,* 756 A.2d 397, 398–400 (D.C. 2000) (affirming denial of new trial on damages by trial judge who found *Barron* and *Bernard* distinguishable). In the instant case, as in *Shomaker,* the jury "could reasonably [have found] that [Ms. Douglas'] pain and suffering were inevitable and that an award of damages specifically for pain and suffering was therefore unwarranted." 669 A.2d at 1296.

### III

On the record before us, we conclude that the jury's verdict was not illogical, nor is there any reason to believe that it was the product of passion, prejudice, or im-

proper motive. The judgment of the trial court is in all respects

*Affirmed.*