**FRED EZRA COMPANY, Appellant,**

v.

**PSYCHIATRIC INSTITUTE OF WASHINGTON, D.C., et al., Appellees.**

No. 95–CV–1122.

District of Columbia Court of Appeals.

Argued Sept. 12, 1996.
Decided Dec. 30, 1996.

Mark A. Gilday, with whom Douglas M. Bregman, Bethesda, MD, appeared on the brief, for appellant.

Jeffrey J. Hines, Washington, DC, counsel for appellee, Pat Dixson. Thomas D. Eidt, Fessende, entered an appearance for Pat Dixson.

Before RUIZ and REID, Associate Judges, and KRAMER,* Associate Judge, Superior Court.

REID, Associate Judge:

Appellant, The Fred Ezra Company, Inc., appeals from a trial court order granting summary judgment to appellees, Psychiatric Institute of Washington, D.C., Inc.; its parent company NME Specialty Hospitals, Inc., successor to the Psychiatric Institutes of America, Inc.; Dr. Howard Hoffman, medical director of the Psychiatric Institute of Wash-

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1995 Repl.).

ington, D.C.; and Pat Dixson, a District of Columbia real estate broker employed by Pat Dixson Realty and the former wife of Dr. Hoffman. (Hereafter, we refer to the Psychiatric Institute of Washington, D.C., NME Specialty Hospitals, Inc., and the Psychiatric Institutes of America, Inc., collectively as "the Institute.") The trial court granted summary judgment on the ground that Ezra's April 29, 1994, complaint for breach of contract, unjust enrichment and tortious interference with contract is barred by the applicable statute of limitations.[1] Ezra contends that under the discovery rule and the doctrine of fraudulent concealment, the applicable limitations period was tolled. We affirm the grant of summary judgment to the appellees on the unjust enrichment count of Ezra's complaint.[2] We reverse, however, on the breach of contract and tortious interference with contract claims on the ground that there are genuine issues of material fact that preclude summary judgment on those claims.

## FACTUAL SUMMARY

In May 1986, the Institute entered into an exclusive agreement with Ezra "to locate and negotiate ... a building site in the downtown Washington area." The Institute agreed to "refer to [Ezra] all site offerings and solicitations which we may have on file or shall receive from sellers, brokers or others, for possible action and evaluation." The agreement described Ezra as the Institute's "exclusive broker," but specified that Ezra "shall look to the building owners or their agents for brokerage commissions." On October 8, 1986, the agreement was modified to desig-

nate Ezra as the Institute's "exclusive real estate broker ... to locate and negotiate for space for [the Institute] in the Washington Metropolitan area." The other terms of the agreement remained the same. The Institute terminated the agreement on April 22, 1987.

On April 29, 1994, Ezra filed a verified complaint against the Institute, Dr. Hoffman and Ms. Dixson. Ezra sued the Institute for breach of contract.[3] It alleged that before its contract was terminated, the Institute, without notice to or involvement by Ezra, and in direct breach of the exclusivity terms of that contract, had begun negotiating with another broker, Ms. Pat Dixson, for a property the Institute should have referred to Ezra, and which it ultimately leased. Ezra also sued Dr. Hoffman and Ms. Dixson for tortious interference with contract, and alleged that they both knew that their negotiations for the property were in breach of Ezra's agreement with the Institute, and maliciously interfered with the contract in order to obtain the commission due Ezra. During discovery, the parties set forth their respective accounts of transactions relating to Ezra's complaint.

During the period the agreement was in effect, Ezra informed the Institute of the availability of a building located at 4228 Wisconsin Avenue, N.W. Dr. Howard Hoffman, the medical director of the Institute who was in charge of the office relocation, rejected the building because its uptown location "would compete with an existing [Institute] location on MacArthur Boulevard." Shortly after its agreement was terminated on April 22, 1987,

---

1. All parties agree that the applicable statute of limitations on these claims is three years. *See* D.C.Code § 12–301(7), (8) (1995 Repl.).

2. Ezra conceded during oral argument that the statute of limitations' principles applicable to its unjust enrichment count are not the same as those which relate to its breach of contract and tortious interference with contract claims. Its unjust enrichment count is based solely on the fact that "Ezra arranged the introduction of the Defendants ... to [the property in question] and made the Defendants aware of this site as a possibility for [the Institute's] proposed relocation." That introduction took place in 1986 or 1987. Since Ezra did not file its complaint until 1994, clearly the three year statute of limitations

had expired with respect to the unjust enrichment claim. *See* n. 3, *infra*.

3. Ezra also included a claim of unjust enrichment against the Institute and Specialty. Unlike the breach of contract and interference with contract claims, this claim was based on Ezra's telling the Institute about the property at issue before the contract was terminated. At oral argument, Ezra conceded that this claim is barred by the statute of limitations. Based on that concession, the Institute argued for the first time that if one claim arising out of a contract is barred by the statute of limitations, all must be barred. We have been provided with no legal authority in support of this argument and find it unpersuasive on the facts before us.

Ezra learned that [the Institute] was negotiating the purchase of a building located at 4228 Wisconsin Avenue. The negotiations were being conducted by Ms. Dixson. Ms. Dixson was then the wife of Dr. Howard Hoffman, the person designated to head the Wisconsin Avenue office. The Institute executed a lease for 4228 Wisconsin Avenue on December 2, 1987, and Ms. Dixson received a one hundred seventy-five thousand dollar referral fee, which she shared with Dr. Hoffman.[4] The Institute occupied the property in early 1989, erected a sign outside the building, and commercially advertised itself at that location.

Ezra claims that its principal, Mr. Fred Ezra, learned at a January 7, 1994, dinner party, attended by Ms. Dixson and mutual friends, Graham and Pat Kelley, that Ms. Dixson made a referral of the Wisconsin Avenue property to the Institute during the period of Ezra's agreement.[5] Ezra maintains that sometime in 1987, shortly after the termination of its agreement, Ezra specifically asked Dr. Hoffman and Russell D. Ragland, the Executive Vice President and the Chief Financial Officer of the Institute whether Ms. Dixson had referred the Wisconsin Avenue property during the period of Ezra's agreement. According to Ezra, both Dr. Hoffman and Mr. Ragland informed Mr. Ezra that the building had not been located or referred to the Institute prior to the termination of Ezra's agreement. Mr. Ezra further insists that he specifically told Mr. Ragland that if the building had been located during the period of its agreement, Ezra was entitled to a commission as broker, and that Mr. Ragland "assured [Ezra] that it was not." With these assurances, Ezra decided to pursue other matters he believed would be more productive.

The appellees dispute Ezra's account of events. Ms. Dixson asserted that she became involved with the Institute's relocation project in May 1987 "as the result of a chance luncheon meeting." However, she also indicated that the lease negotiations lasted more than a year from the time the Wisconsin Avenue building was referred to the Institute to the date the lease agreement was executed on December 2, 1987, which would mean that her work on the project actually began during the term of Ezra's agreement. Ezra also takes issue with Ms. Dixson's account based on the fact that the Institute filed a complicated ninety-three page Certificate of Need application with the District of Columbia government on June 16, 1987, less than two months after the termination of Ezra's agreement.[6] Ezra insists that the steps required to complete the application could not have been completed in less than two months.

After the close of discovery, the defendants moved for summary judgment. The Institute and Dr. Hoffman's motion for summary judgment, joined by Ms. Dixson, was based on the grounds that (1) Ezra's claims are time-barred by the applicable three-year statute of limitations and (2) Ezra could not prevail on the merits of its claims. They argued that the discovery rule does not apply to Ezra's causes of action because that rule has been applied "only in cases involving professional negligence or malpractice." Furthermore, they maintained that the record did not support the existence of fraudulent concealment. In her separate motion for summary judgment, Ms. Dixson not only argued the statute of limitations, but also asserted that (1) she took no "affirmative steps to conceal from [Ezra its] cause of action" and (2) she "did not know about [Ezra's] contract."

Ezra opposed the summary judgment motions on the ground that there are genuine issues regarding material facts that should be resolved at trial. Ezra attached a listing of some forty-seven "facts as to which there is a genuine issue necessary to be litigated." These facts included:

Mr. Ezra was surprised by Ms. Dixson's disclosure.

4. Ms. Dixson said she gave half of the commission to Dr. Hoffman. Mr. Ezra maintained that Ms. Dixson told him that Dr. Hoffman insisted on sixty percent of the commission.

5. Ms. Kelley confirmed Mr. Ezra's account of his conversation with Ms. Dixson, and indicated that

6. *See* Public Health and Medicine regulations governing the certificate of need process for health facilities, at 22 DCMR §§ 4000 *et seq.* (1986).

(1) Dr. Hoffman and Mr. Ragland stated that the Wisconsin Avenue building was located after the termination of Ezra's agreement.

(2) In 1986, Dr. Hoffman asked Ms. Dixson to 'be on the lookout for a building.'

(3) Ms. Dixson actively sought a building for the Institute in 1986.

(4) Ms. Dixson knew of Ezra's involvement with the Institute's search for a building.

(5) Dr. Hoffman was an officer of Pat Dixson Realty from 1981 to 1983.

(6) Ms. Dixson did not refer the building to the Institute until 1987.

(7) Negotiation of the lease on the Wisconsin Avenue building took more than a year.

(8) Ms. Dixson could not find her files relating to the Wisconsin Avenue building, even though her policy is to retain all files dating back to 1981 and continuing to the present.

(9) Dr. Hoffman received half of Ms. Dixson's referral fee pertaining to the Wisconsin Avenue building.

(10) Ms. Dixson told Mr. Ezra on January 9, 1994, that she knew Ezra was involved with the search for a building for the Institute, but 'I thought you were involved downtown.'

(11) Mr. Ezra was surprised by Ms. Dixson's 1994 revelation regarding her knowledge of Ezra's agreement with the Institute.

The trial court concluded that: (1) Ezra's claims were barred by the statute of limitations because "[Ezra] knew or should have known that it had a cause of action in this matter as early as 1987, and certainly by 1989"; (2) the statute was not tolled under the discovery rule; (3) Ezra failed to "[establish] that the fraudulent concealment exception applies to this case"; and (4) "there are no genuine issues of material fact and the defendants are entitled to judgment as a matter of law." Except for its statement that "[t]he 'additional' information Ezra gained at the January 1994 dinner conversation with Dixson was no more than confirmation of the same rumor Ezra had heard seven

years earlier," the trial court's memorandum and order granting summary judgment is silent regarding the factual issues raised by Ezra. Because of its ruling on the issue concerning the statute of limitations, the trial court did not make findings of fact or set forth conclusions of law with respect to the merits of Ezra's breach of contract or tortious interference with contract claims.

## ANALYSIS

"In reviewing a motion for summary judgment, 'we must assess the record independently ... [and view it] in the light most favorable to the party opposing the motion.'" *Walton v. District of Columbia,* 670 A.2d 1346, 1353 (D.C.1996) (referencing *Colbert v. Georgetown Univ.,* 641 A.2d 469, 472 (D.C.1994) (en banc)). *See also Young v. Delaney,* 647 A.2d 784, 788 (D.C.1994). "We will affirm the entry of summary judgment if 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.'" *Holland v. Hannan,* 456 A.2d 807, 814 (D.C. 1983) (quoting Super. Ct. Civ. R. 56(c)). However, "[a] motion for summary judgment should be granted only if '(1) taking all reasonable inferences in the light most favorable to the nonmoving party, (2) a reasonable juror, acting reasonably, could not find for the nonmoving party, (3) under the appropriate burden of proof.'" *Sherman v. District of Columbia,* 653 A.2d 866, 869 (D.C.1995) (quoting *Galloway v. Safeway Stores, Inc.,* 632 A.2d 736, 738 (D.C.1993)).

Ezra contends that because of the Institute's fraudulent concealment through its agents Dr. Hoffman and Mr. Ragland, it did not discover it had a claim until January 7, 1994, and that the filing of its complaint on April 29, 1994, was timely under the statute of limitations. The Institute, Dr. Hoffman and Ms. Dixson argue that Ezra had actual knowledge of its claims against the defendants soon after the termination of its agreement in April 1987, and that the discovery rule does not apply to breach of contract actions.[7] Furthermore, they assert that the

**7.** Appellees rely on *Woodruff v. McConkey,* 524 A.2d 722 (D.C.1987) in their contention that the

discovery rule does not apply to breach of contract actions, and that it "applies only in cases in

doctrine of fraudulent concealment does not apply because Ezra did not exercise reasonable diligence in investigating its potential causes of action. Finally, they insist that Ezra cannot prevail on the merits of its claims.

In *Diamond v. Davis*, 671 A.2d 905, 922 (D.C.1996), we said that the standard governing a plaintiff's duty relating to its potential causes of action is "the same in all cases to which the discovery rule applies, regardless of the presence or absence of fraud, or the characterization of that fraud." In concluding that "what constitutes notice of a cause of action for accrual purposes in cases such as this involving fraud, is the same as that which obtains in nonfraud cases (citation omitted)," *Id.* at 913, we stated the standard as follows:

> In every case, the plaintiff has a duty to investigate matters affecting her [or its or his] affairs with reasonable diligence under all the circumstances. Once the plaintiff actually knows, or with the exercise of reasonable diligence would have known, of some injury, its cause-in-fact, and some evidence of wrongdoing, then she [or it or he] is bound to file her [or its or his] cause of action within the applicable limitations period, measured from the date of her [or its or his] acquisition of the actual or imputed knowledge.

*Id.* at 922. We also said that "[w]hat constitutes the accrual of a cause of action is a question of law (citation omitted) [but][w]hen accrual actually occurred in a particular case is a question of fact (citation omitted)." *Id.* at 911. We further stated that "[i]n all cases to which the discovery rule applies the inquiry is highly fact-bound and requires an evaluation of all the plaintiff's circumstances." *Id.* at 913. Given our ruling in *Diamond*, the

question is whether Ezra filed its claim within three years of the time it knew, or through the exercise of reasonable diligence should have known, of its claim.

Ezra relies specifically on the doctrine in our pre-*Diamond* case law that tolls the running of a statute of limitations where there has been fraudulent concealment of the existence of a cause of action. *See Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992, 996 (D.C.1978). "[O]ne well established defense to a claim of fraudulent concealment is that the plaintiff knew, or by the exercise of due diligence could have known, that he may have had a cause of action." *Id.* (quoting *Westinghouse Electric Corp. v. City of Burlington, Vermont*, 122 U.S.App. D.C. 65, 67, 351 F.2d 762, 764 (1965)). Because the fraudulent concealment doctrine is subsumed within the general principles articulated in *Diamond*, we conclude that Ezra's reliance on this doctrine adds nothing additional to arguments for reversal.

**I.**

First, we reject appellees' argument that Ezra's claims are time-barred because Ezra had actual notice of its breach of contract and tortious interference with contract causes in mid–1987 or, at the latest in 1989, when the Institute occupied 4228 Wisconsin Avenue, N.W. Ezra's breach of contract and tortious interference with contract claims are predicated on Ms. Dixson's referral of the Wisconsin Avenue property to the Institute and negotiations between the Institute, Ms. Dixson and Dr. Hoffman for that property during the existence of Ezra's exclusive real estate brokerage agreement with the Institute. Ezra insists that it did not become aware, until January 1994, that these negotiations were conducted during the period of

which the plaintiff has justifiably placed some special trust or reliance in the defendant." *Woodruff*, however, suggests the opposite, stating that "[t]he discovery rule so far has been applied by this court only in cases involving professional negligence or malpractice ... *regardless of whether the action is expressed in terms of contract or not.*" 524 A.2d at 727 (emphasis added). Moreover, on the record before us, we conclude that *Woodruff* is not applicable. The complaint in that case was based solely on two homeowner's claims that they were entitled to a re-

fund of approximately six or seven thousand dollars because their home improvement contractor did not have a license. The court concluded that the doctrine of fraudulent concealment was not applicable because the record did not reveal that defendant did "something of an affirmative nature designed to prevent discovery of the cause of action." 524 A.2d at 728. In contrast to *Woodruff*, Ezra has alleged facts, which if proven, will show that appellees took steps to prevent Ezra's discovery of potential causes of action.

its agreement, because Dr. Hoffman and the Institute's Executive Vice President, Mr. Ragland, fraudulently concealed the information when Mr. Ezra specifically asked them, shortly after April 22, 1987, whether Ms. Dixson had referred the Wisconsin Avenue property to the Institute during the period of Ezra's agreement. Both men answered in the negative. Mr. Ezra's inquiry and Mr. Ragland's and Mr. Hoffman's responses raise a factual issue about whether Ezra had actual notice of its breach of contract and tortious interference with contract claims before January 1994. Hence, we cannot say as a matter of law that Ezra had actual notice of its claim within the three year statute of limitations.

## II.

■ Second, we reject appellees' argument that they were entitled to summary judgment as a matter of law on Ezra's causes of action because, they assert, Ezra did not exercise reasonable diligence in investigating its potential causes of action. *Diamond* makes crystal clear the fact-laden inquiry that must be made to determine whether a plaintiff had inquiry notice. Yet, the trial court did not consider the genuine material issues of fact raised by Ezra that need to be resolved to determine whether, given Ezra's claim of fraudulent concealment, Ezra exercised due diligence in identifying potential causes of action, and filed its claim at the time of actual or inquiry notice. The alleged assurances by Dr. Hoffman and Mr. Ragland that the Wisconsin Avenue building was not referred to the Institute during the period of Ezra's agreement are highly significant and material. Appellees are disingenuous in arguing that Ezra failed to investigate with reasonable diligence because it went on to other things after being told by Dr. Hoffman and Mr. Ragland, principals of the Institute, that the building was not referred during Ezra's contract. On the record before us, Ezra cannot be faulted for believing that these two men had made truthful statements. Hence, we cannot say as a matter of law that Ezra failed to exercise reasonable diligence in investigating its potential claims.

## III.

■ Third, we reject the appellees' position that based on the record before us, Ezra "cannot sustain its burden with respect to the merits" of its claims. Appellees argue, *inter alia,* that Ezra did not perform any work in connection with the Wisconsin Avenue site. Ezra's claims, however, are based upon the failure of the Institute to refer the property to it in accordance with its agreement. Obviously, no work could be performed without the referral. Appellees also argue that there is no evidence that Dr. Hoffman and Ms. Dixson were aware of the Institute's October 1986 agreement with Ezra. However, Ezra argues that a reasonable inference from the undisputed facts is that Ms. Dixson knew that Ezra's agreement was in effect when she referred the Wisconsin Avenue Building to the Institute, and may not have stated the correct date on which she first became involved with the building. Whether appellees were aware of Ezra's exclusive agreement is a material issue of fact which must be resolved by the factfinder before conclusions of law can be reached with regard to Ezra's tortious interference with contract claim. Hence, on the record before us, we cannot conclude as a matter of law that Ezra cannot prevail on the merits of its complaint.

For the reasons set forth above, we reverse the judgment of the trial court granting summary judgment in favor of the Institute, Dr. Hoffman and Ms. Dixson, and remand the case for further proceedings consistent with this opinion.

*Reversed and remanded.*