**Helen WARREN, Appellant,**

v.

**MEDLANTIC HEALTH GROUP, INC, et al., Appellees.**

**No. 05–CV–1282.**

District of Columbia Court of Appeals.

Argued Feb. 1, 2007.

Decided Sept. 13, 2007.

Robert L. Bell, with whom Allen T. Eaton III was on brief, for appellant.

Alfred F. Belcuore, Washington, District of Columbia, for appellees Steven K. Kaufman, M.D., and Kaufman & Zinsmeister, M.D., P.A.

Edward Horowitz and Albert D. Brault, with whom Robert Maynard, and Crystal S. Deese were on the brief, for Medlantic Healthcare Group, Inc. and Associated Anesthesiologists Service, P.C.

Before WASHINGTON, Chief Judge, REID, Associate Judge, and PRYOR, Senior Judge.

REID, Associate Judge:

In this medical malpractice case appellant, Helen Warren, challenges the motions court's order granting summary judgment in favor of appellees Dr. Steven K. Kaufman, and Kaufman & Zinsmeister ("K & Z"), and granting summary judgment to all defendants on her claim for damages for pain and suffering. She also argues that the trial court committed reversible error during the trial involving appellees Medlantic Healthcare Group, Inc. ("Medlantic") and Associated Anesthesiologists Service, P.C. ("Associated Anesthesiologists") by curtailing her cross-examination of defendants' medical expert. We reverse the order of the motions judge granting summary judgment to Dr. Kaufman & K & Z and remand the case for trial with respect to those defendants. However, we affirm the judgment of the trial court with respect to the jury verdict in favor of Medlantic and Associated Anesthesiologists.

## FACTUAL SUMMARY

The record before us shows that in March of 2000, Ms. Warren's husband, decedent Kenneth M. Warren, underwent a CT scan of his chest which revealed a small nodule or lesion in the lower lobe of his left lung. Mr. Warren's primary care physician recommended surgery to remove the nodule, and also referred Mr. Warren to the office of K & Z, a cardiology practice group (then Oboler, Kaufman, Zinsmeister, M.D., P.A.), where he was examined by Dr. Kaufman. Dr. Kaufman was aware of Mr. Warren's planned pulmonary surgery, noting in his records that cardiac studies would be performed promptly "so that lung surgery could be scheduled." A dual isotope study performed by Dr. Oboler revealed Mr. Warren had "severe coronary artery disease in more than one artery," including "severe disease of the left anterior descending" branch of the coronary artery system. On May 26, 2000, Dr. Kaufman performed cardiac surgery on Mr. Warren at the Washington Hospital Center (owned by Medlantic), stretching an artery and placing two stents there to prevent it from collapsing. Dr. Kaufman noted in Mr. Warren's medical record, "[i]t is felt that [decedent] can undergo pulmonary surgery with low to moderate risk." On May 27, 2000, Dr. Bruce Zinsmeister of K & Z examined Mr. Warren instead of Dr. Kaufman, and discharged him from the hospital on May 27, 2000, with instructions to follow up in seven to ten days.

On May 31, 2000, Mr. Warren had lung surgery to remove the nodule. Immediately following the surgery he was admitted to the Post–Anesthesia Care Unit ("PACU") of Medlantic, and he was moved out of that unit into a regular ward on the morning of June 1, 2000. On that day, Dr. Bruce Zinsmeister of K & Z performed a post-operative examination of Mr. Warren and ordered a "12–lead" electrocardiogram ("EKG"). Mr. Warren's condition deteriorated during the evening of June 1. He was taken to the intensive care unit and died around 1:30 a.m. on June 2, 2000. The autopsy report listed the cause of death as "a myocardial infarction following stent placement and left lower lobe lung resection."

## ANALYSIS

### The Summary Judgment Issue

Ms. Warren contends that the motions court improperly granted summary judgment in favor of Dr. Kaufman and K & Z. She asserts that Dr. Kaufman violated the national standard of care in allowing her husband to undergo lung surgery so soon after having heart surgery; that Dr. Zinsmeister, who "was rendering care on behalf of [K & Z]," together with Dr. Kaufman, was negligent in assessing Mr. Warren's condition on June 1, 2000, and in failing to follow up on the results of the 12–lead EKG; and that K & Z is liable under the doctrine of *respondeat superior*. Dr. Kaufman and K & Z in essence argue that summary judgment was proper because Ms. Warren did not establish a *prima facie* case of negligence or medical malpractice, and that the unstated claim against Dr. Zinsmeister was barred by the statute of limitations and unsupported by evidence.

### Standard of Review

"A motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Williams v. District of Columbia,* 902 A.2d 91 (D.C.2006); *see also* Super. Ct. Civ. R. 56(c) (stating, in part, that summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). We review the trial court's decision to grant summary judgment *de novo. Allman v. Snyder,* 888 A.2d 1161 (D.C. 2005). "In order to avoid summary judgment there must be some significant probative evidence tending to support the complaint so that a reasonable fact-finder could return a verdict for the non-moving party." *Lowrey v. Glassman,* 908 A.2d 30 (D.C.2006). "A motion for summary judgment should be granted only if (1) taking all reasonable inferences in the light most favorable to the nonmoving party, (2) a reasonable juror, acting reasonably, could not find for the nonmoving party, (3) under the appropriate burden of proof." *Fred Ezra Co. v. Psychiatric Inst. of Washington, D.C.,* 687 A.2d 587, 591 (D.C.1996) (quoting *Sherman v. District of Columbia,* 653 A.2d 866, 869 (D.C.1995)) (internal quotation marks omitted). "To defeat a motion for summary judgment in a medical malpractice action, the non-movant must establish a prima facie case of medical malpractice, consisting of 1) establishing the applicable standard of care, 2) showing that the appropriate standard has been violated, and 3) proving a causal relationship between the violation and the alleged harm." *Ferrell v. Rosenbaum,* 691 A.2d 641, 646 (D.C.1997) (citations omitted). "If the case turns on controverted facts and the credibility of the witnesses, the case is properly for the jury," [not summary judgment.] *In re Estate of Walker,* 890 A.2d 216 (D.C.2006), and those matters dealing with negligence "frequently are not susceptible of summary adjudication but should be resolved by trial in the ordinary manner...." *Childs v. Purll,* 882 A.2d 227 (D.C.2005). Thus, "[t]he role of the court [on a summary judgment motion] is not to try an issue as a fact finder, but rather to decide whether there are genuine issues of material fact to be decided by the jury." *LaPrade v. Rosinsky,* 882 A.2d 192 (D.C. 2005).

## Factual Context

The record shows that the following evidence and pleadings were available to the motions judge, the Honorable James E. Boasberg, prior to his October 6, 2004 order granting summary judgment to Dr. Kaufman and K & Z. On June 1, 2001, Ms. Warren filed a complaint in which she alleged, in part, that Dr. Kaufman had cleared Mr. Warren for "low to moderate risk" lung surgery; that he and others "were aware that Mr. Warren was scheduled to undergo lung surgery the next week;" that lung surgery took place on May 31, 2000; that there were "warning signs of a post-operative myocardial infarction"; that "Mr. Warren was assessed by a cardiologist (identity unknown)"; that the unknown cardiologist "ordered a 12–lead EKG"; and that "[t]he results of the 12–lead EKG performed on June 1, 2000 were not contained in the medical records obtained from the Washington Hospital Center." In Count III of her complaint, Ms. Warren alleged, in part, that Dr. Kaufman was negligent in providing "careful and competent medical care" to Mr. Warren. Count IV of the complaint asserted that Dr. Kaufman, "both individually and on behalf of a Professional Corporation [ ] known as [K & Z] owed a duty to ... [Mr. Warren], to provide reasonable medical care and was negligent in doing, or failing to do so." Ms. Warren also asserted allegations of negligence against Medlantic and Associated Anesthesiologists.

The significant developments in this case began when Mr. Warren's primary care physician, Dr. Arthur M. West, referred him to Dr. David C. Gross of Capital Pulmonary Internists, P.C. In a letter to Dr. West, dated April 10, 2000, Dr. Gross re-

ported the results of a chest x-ray and a CAT scan revealing a nodule in Mr. Warren's lower left lung. Dr. Gross instructed Mr. Warren "to see Dr. [ ] Kaufman for cardiac clearance," as well as Dr. Chris Eger, a thoracic surgeon. After his cardiac consultation with Mr. Warren on April 25, 2000, Dr. Kaufman recorded his "impression," stating: "The patient has a pulmonary nodule which will require chest surgery. In view of his risk factors, dual isotope imaging will be performed in consideration of possible associated coronary artery disease. This will be done at earliest convenience so that surgery can be scheduled." Dr. Oboler, then of Oboler, Kaufman, Zinsmeister, M.D, reported the results of the dual isotope imaging study on May 12, 2000; his "overall impression" was that Mr. Warren had "severe ischemic heart disease, either triple vessel or left main." Around the same time, Dr. Kaufman noted that Mr. Warren displayed "[s]evere disease of the left anterior descending [coronary artery]," and stated: "In view of the findings, and to minimize [Mr. Warren's] risk for thoracic surgery, it is felt that coronary intervention is indicated." After Mr. Warren's cardiac surgery on May 26, 2000, Dr. Kaufman wrote: "Mr. Warren has improved perfusion subsequent to stenting of his left anterior descending. It is felt that he can undergo pulmonary surgery with low to moderate risk." Mr. Warren was directed to see Dr. Kaufman in seven to ten days for a follow-up appointment. Mr. Warren was discharged from the hospital on May 27, 2000.

Mr. Warren re-entered the hospital on May 31, 2000 for surgical procedures on his lung, including a left thoractomy; the surgeon, Dr. Eger, found no mass. Dr. Zinsmeister, of K & Z, who had seen and discharged Mr. Warren on May 27, 2000, also examined him following the lung surgery. In his deposition of February 11, 2003, Dr. Zinsmeister explained that, at that time, he and Doctors Oboler and Kaufman " 'round[ed] on' [visited] each other's patients," and that he also saw Mr. Warren on June 1, 2000, because "Thursdays [were his] turn to round on the patients at the Hospital Center." He stated that for patients with a history of cardiac artery disease, he and Dr. Kaufman "followed the protocol as outlined in the guidelines to perioperative cardiovascular evaluation...." [1] The guidelines recommended a 12-lead EKG following an operation on a person with coronary artery disease. In response to a question concerning the importance of the 12-lead EKG, Dr. Zinsmeister quoted from recommendations set forth in the guidelines: "[T]he strategy of using an EKG immediately after the surgical procedure and on the first and second days postoperatively had the highest sensitivity for detection of myocardial infarction [death of heart tissue]." Dr. Zinsmeister ordered a 12-lead EKG for Mr. Warren on June 1, 2000, but said he had no "knowledge whether that was performed." He first looked for the results of the 12-lead EKG that he had ordered after being notified of the lawsuit against Dr. Kaufman. He could not find it in Mr. Warren's chart, and Dr. Kaufman said in his March 21, 2002 deposition that he could not locate the results of that EKG.

1. The complete name of the document is Guidelines for Perioperative Cardiovascular Evaluation for Noncardiac Surgery, published in the March 15, 1996 edition of Circulation. The Guidelines, which were developed by the American Heart Association and the American College of Cardiology, specify that they "are intended for physicians who are involved in the preoperative, operative, and postoperative care of patients undergoing noncardiac surgery," and "[t]hey provide a framework for considering cardiac risk of noncardiac surgery in a variety of patient and surgical situations."

The Washington Hospital Center medical records for Mr. Warren reveal that the first twenty-four hours following his lung surgery "went well," but thereafter his condition worsened, with symptoms including "decreased mental state," and "bradycardia" [abnormally slow heart beat]. Eventually he had to be "resuscitated" and was "taken to the intensive care unit." Later resuscitation failed. Hospital records reflect "a large myocardial infarct involving his left anterior descending distribution." The final autopsy report, dated August 1, 2000 states, in part, "[t]his elderly male with severe coronary artery disease died of myocardial infarction following LAD stent placement and left lower lung resection."

After reviewing Mr. Warren's medical records, Dr. David Jacobs, a specialist in surgery, anesthesiology and surgical critical care, wrote to Mrs. Warren on August 11, 2000, stating in part that Mr. Warren "appears to have sustained a postoperative myocardial infarction" which "apparently went unrecognized for more than 24 hours." He noted "that the EKG obtained on June 1, 2000 is not in the patient's record." In his deposition of April 30, 2003, Dr. Jacobs was asked his opinion about Dr. Zinsmeister. He testified that the 12–lead EKG "was ordered and not followed up on in a timely fashion," and that the failure to do so was below the standard of care. He expressed the view that the EKG "would have shown" "myocardial infarction." Furthermore, he asserted that "it may have been difficult for [Mr. Warren] who already had an incision on his chest to be able to distinguish between surgical pain and [ ] cardiac or ischemic chest pain."

Dr. Lorne B. Sheren, a specialist in internal medicine, anesthesiology, and quality assurance and utilization review medicine, gave a deposition on March 17, 2003. He concentrated, in part, on the short interval between Mr. Warren's cardiac surgical procedure and his lung surgery, declaring: "[I]t's my opinion that, to a reasonable degree of certainty, [ ] performing an operation within a short period of time after angioplasty and stent insertion poses an unacceptably high risk to a patient of perioperative myocardial infarction." He relied on "several clinical studies" to support his opinion. These studies mentioned a time period between forty to ninety days, and Dr. Sheren testified, "it's my opinion that the two to three month window is an accepted standard within the anesthesia community and was at the time of Mr. Warren's surgery as well." Given the shorter interval between Mr. Warren's surgeries, Dr. Sheren opined that Mr. Warren "would have a significantly higher than average risk of having a perioperative cardiac event." And in his August 26, 2004 affidavit, Dr. Sheren summarized his opinions, declaring in part:

[I]t is my opinion that Dr. Kaufman . . . violated the national standard of care in clearing Mr. Warren for surgery.

It is my opinion to a reasonable degree of medical certainty that the action[ ] of Dr[ ]. Kaufman in clearing Mr. Warren for lung surgery prematurely caused or contributed to causing or was a substantial factor in causing the heart attack in the first place.

. . . .

It is my opinion, to a reasonable degree of medical certainty, that the failure of Dr. Zinsmeister to follow up to insure that the 12–lead EKG he ordered was performed and his failure to followup and insure that the EKG was performed and read was a violation of the national standard of care.

In view of the fact that Dr. Zinsmeister knew that Mr. Warren had undergone a serious lung operation within five days

after stent placement, he knew or should have known that Mr. Warren was at high risk for a heart attack. His failure to read the EKG combined with the deficient care he received from the other members of the health care team operated together to deprive Mr. Warren of a substantial chance of recovery.

In the Joint Pretrial Statement, filed on September 13, 2004, and signed by attorneys for Ms. Warren, Dr. Kaufman, K & Z, and others, Ms. Warren's claims included the following: (1) Dr. Kaufman "was negligent in clearing Mr. Warren for lung surgery with 'low to moderate risk' on May 27, 2000 after performing angioplasty on him the day before .... '"; and (2) "Dr. Bruce Zinsmeister, a cardiologist associated with Defendant Dr. Kaufman was negligent in his assessment of Mr. Warren during the day of June 1, 2000[;][s]pecifically, Dr. Zinsmeister ordered a 12–lead EKG but never returned to review the EKG and never made any inquiries or took any steps to locate the results of the 'missing' EKG." The Pretrial Order, filed by Judge Boasberg on September 14, 2004, included the statement: "The claims and defenses of the parties are set forth in the Joint Pretrial Statement. No other claims or defenses can be raised at the trial absent exceptionally good cause."

Dr. Kaufman and K & Z filed a motion for summary judgment in August 2004. In their Statement of Material Facts as to Which There is no Genuine Issue, they declared, in part: "While Mr. Warren was under Dr. Kaufman's care, at no time was Dr. Kaufman aware that Mr. Warren had made arrangements to have the lung surgery performed on a date certain." In her opposition to Dr. Kaufman's and K & Z's motion for summary judgment, Ms. Warren cited Dr. Kaufman's April 25, 2000 medical note recognizing that Mr. Warren was to undergo surgery to remove a pul-

monary nodule. Moreover, she took issue with defendants' interpretation of Dr. Kaufman's written words of May 26, 2000—"It is felt that [Mr. Warren] can undergo pulmonary surgery with low to moderate risk." Ms. Warren argued that "any person reading [these words] could easily be led to believe that Mr. Warren's cardiologist had cleared him for the contemplated lung surgery with low to moderate risk." Ms. Warren also maintained that "a jury could reasonably find that Dr. Kaufman violated the national standard of care when he cleared Mr. Warren for surgery without placing any time restrictions on the date of the surgery." She focused on the deposition testimony of Dr. Sheren relating to the risk of a myocardial infarction in the event of premature lung surgery.

Defendants Kaufman & K & Z further attacked Ms. Warren's case, in part, on the grounds that her complaint did not allege any negligence against Dr. Zinsmeister; that with respect to K & Z, the complaint was "based solely upon the employment of Dr. Kaufman"; that neither of Ms. Warren's experts is a cardiologist; and that neither "opined that, more likely than not, had the EKG been performed, Mr. Warren would have survived." In response, Ms. Warren emphasized the "concerted action" of Doctors Kaufman and Zinsmeister, and invoked a section of Maryland's law on Corporations and Associations relating to the liability of a professional corporation "for any negligent or wrongful act or misconduct committed by any officer, agent, or employee while engaged in performing a professional service on behalf of the corporation." She also discussed the evidence which she believed showed the negligence of Dr. Zinsmeister. In their reply to Ms. Warren's opposition, Defendants Kaufman and K & Z questioned Ms. Warren's interpretation of Dr. Kaufman's medical notes and generally stressed their belief that

defendants did not breach the standard of care; that Ms. Warren's proof failed to establish causation; that "Dr. Sheren's testimony will not allow a reasonable finding of medical negligence"; that the claim of negligence by Dr. Zinsmeister is a new claim barred by the statute of limitations which, at any rate, would fail due to the flawed testimony of Dr. Sheren.

## Discussion

 Our *de novo* review of the record in this case reveals that the trial court ventured into an arena reserved for the fact finder. As we have stated, "[t]he role of the court [on a summary judgment] motion is not to try an issue as a fact finder," *LaPrade, supra,* 882 A.2d at 196; and "[i]f the case turns on controverted facts and the credibility of the witnesses, the case is properly for the jury," [not summary judgment,] *In re Estate of Walker, supra,* 890 A.2d at 221. Here, Judge Boasberg recognized Ms. Warren's central allegation against Dr. Kaufman: "[H]e cleared decedent for lung surgery on May 31, 2000, which was too soon"; and "by failing to state that pulmonary surgery should have been delayed, [Dr. Kaufman's] note [of May 26, 2000,] effectively cleared decedent for immediate surgery." He discounted Ms. Warren's interpretation of Dr. Kaufman's medical note by placing his own interpretation on the note, stating in part:

> Plaintiff nonetheless argues the note should have said that decedent should not have lung surgery in the next week. That cannot be the basis of negligence by omission. The note did not say not to run a marathon or climb a mountain either, but one could not argue that, had decedent attempted either task, his doctor was negligent for failure to warn.

A reasonable jury, however, might conclude that Dr. Kaufman's note was not a mere "failure to warn" (much less to warn Mr. Warner "not to run in a marathon")

but an affirmative assurance that further surgery could be done without delay—an assurance on which another surgeon might reasonably rely. In addition, the motions judge not only resolved any question of credibility in favor of Dr. Kaufman, but also implicitly rejected the testimony of Dr. Sheren (as it appeared in his March 17, 2002 deposition and his affidavit of August 26, 2004), or implicitly decided that the weight to be given Dr. Sheren's testimony was insufficient to shield Ms. Warren from a grant of summary judgment in Dr. Kaufman's favor. Yet, the question of what weight should be given to an expert's testimony is for the jury, not the motions court. *See Rastall v. CSX Transp., Inc.,* 697 A.2d 46, 52–53 (D.C.1997) ("It is for the jury to weigh the evidence and to determine the facts."). Judge Boasberg may be correct that, in the final analysis, Dr. Kaufman will prevail, but that is not the standard by which a motion for summary judgment is to be decided. The record in this particular case, as to the allegation of negligence against Dr. Kaufman, reflects the need to adhere to our cautionary statement that those matters dealing with negligence "frequently are *not susceptible of summary adjudication but should be resolved by trial in the ordinary manner.*" *Childs, supra,* 882 A.2d at 233. In short, under the circumstances of this case, the motions judge's grant of summary judgment in favor of Dr. Kaufman was improper.

With respect to its grant of summary judgment in favor of K & Z, Judge Boasberg rejected Ms. Warren's argument-that "K & Z can also be liable under a theory of *respondeat superior* for [Dr.] Zinsmeister's negligence in the hospital following pulmonary surgery[, because] he did not effectively monitor decedent's treatment and condition, thus leading to his fatal heart attack." Explaining the rationale

for rejecting Ms. Warren's argument, the motions judge declared, in part, "[t]he difficulty with [Ms. Warren's] theory is that it has never been pled. The only count of the Complaint, filed on June 1, 2001, that states a cause of action against K & Z is Count IV," which does not allege negligence against Dr. Zinsmeister. The judge's explanation, grounded in what is perceived to be a flawed complaint, ignores this jurisdiction's standard for notice pleading, as well as developments during the discovery phase of this litigation, the joint pretrial statement filed by the parties, and Judge Boasberg's own pretrial order.

■ As we have said previously, "[t]he District is a notice pleading jurisdiction and 'under Super. Ct. Civ. R. 8(a) and (e), a complaint is sufficient so long as it fairly puts the defendant on notice of the claim against him.'" *Sarete, Inc. v. 1344 U Street Ltd. P'ship*, 871 A.2d 480, 497 (D.C.2005) (quoting *Scott v. District of Columbia*, 493 A.2d 319, 323 (D.C.1985)); *see also Diamond v. Davis*, 680 A.2d 364, 371 n. 8 (D.C.1996). "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Id.* (citations omitted). " 'The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in [District of Columbia] practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of

the court.'" *Id.* at 512–13, 122 S.Ct. 992 (quoting 5 C. WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1202, p. 76 (2d ed.1990)).

■ Here, in paragraph 38 of her complaint, plaintiff alleged that: "During the day of June 1, 2000, Mr. Warren was assessed by a cardiologist (identity unknown) who had also seen him when he was admitted on May 25–26, 2000." When the complaint was drafted, Ms. Warren assumed in paragraph 37 of the complaint that the unknown cardiologist "was a resident and/or an agent and/or an ostensible agent of Defendant Washington Hospital Center's house staff," but indicated that he had "ordered a 12–lead EKG." She further alleged in paragraph 39 that "[t]he results of the 12–lead EKG performed on June 1, 2000 were not contained in the medical records obtained from the Washington Hospital Center." Believing that the unknown cardiologist was an agent, employee or staff member of Medlantic, Ms. Warren asserted negligence in Count I (paragraph 45 of the complaint) against Medlantic for failure to properly treat Mr. Warren by breaching its specified duty of care, including its duty "to[ ] ensure that [p]laintiff's decedent's acute myocardial infarction was properly and timely diagnosed and appropriately treated," as well as a duty "to[ ] ensure that Mr. Warren's post-operative condition was properly evaluated and that all steps necessary and available to diagnose, treat and minimize [p]laintiff's decedent's post-operative condition were taken in a timely manner." Failure to carry out these duties of care "direct[ly] and proximate[ly] resulted in" Mr. Warren's "undiagnosed and untreated post-operative mycardial infarction," as well as his "conscious pain and suffering and death." Hence, the complaint was "sufficiently detailed, and should not [have] be[en] found deficient simply because the plaintiff ha[d]

not learned the name" of the "unidentified cardiologist" by the time the complaint was drafted, or associated him with the proper defendant. *Arnold v. Moore*, 980 F.Supp. 28, 37 (D.D.C.1997) (trial court denied motion to dismiss where names of defendant's officers were not known at time complaint was filed and prior to discovery). Furthermore, since the K & Z Group served as cardiologists for Mr. Warren, they had to have known that the "unknown cardiologist" referenced in the complaint who saw Mr. Warren in late May and ordered a 12–lead EKG on June 1 was a member of their practice group. Indeed, K & Z never denied that the unknown cardiologist in fact was Dr. Zinsmeister of K & Z. In addition, K & Z was on notice in Count IV of the complaint which alleged negligence against K & Z, that negligence was being alleged against Dr. Kaufman (in paragraphs 60 and 61 of the complaint) "individually and as part of a Professional Corporation known as [K & Z]." Hence, in this notice pleading jurisdiction, the motions judge is technically accurate but nevertheless misleading in his conclusion that plaintiff "never ... pled" its theory of *respondeat superior*—that K & Z is liable for Dr. Zinsmeister's negligence following Mr. Warren's pulmonary surgery.

Yet, the litigation did not stop with the complaint, and the motions judge should have decided the motion for summary judgment on the record developed to that point, which would include discovery, depositions, and pretrial documents. In this case, during discovery and prior to preparation of summary judgment pleadings, it became clear that "the unknown cardiologist" was Dr. Zinsmeister of K & Z and that Dr. Zinsmeister conducted "round[s]" for Dr. Kaufman. Consequently the Joint Pretrial Statement filed by the parties on September 13, 2004, which Judge Boasberg incorporated in his Pretrial Order of

September 14, 2004, includes the following statement under the section headed Plaintiff's Claims: "Dr. Bruce Zinsmeister, a cardiologist associated with Defendant Dr. Kaufman was negligent in his assessment of Mr. Warren during the day of June 1, 2000. Specifically, Dr. Zinsmeister ordered a 12–lead EKG but never returned to review the EKG and never made any inquiries or took any steps to locate the results of the 'missing' EKG." This statement made it clear, as had the discovery and depositions, that the acts of negligence alleged in the complaint against Medlantic due to the actions of "the unknown cardiologist" were applicable to the count of negligence against K & Z. Thus, although Dr. Zinsmeister could not be held individually liable at that point, his actions were relevant to the negligence count against K & Z because he, rather than Dr. Kaufman, saw Mr. Warren in late May and ordered the 12–lead EKG on June 1, 2000, as a member of the K & Z cardiology practice group. Under these circumstances, the motions judge should have considered the motion for summary judgment in light of the then existing record, which was not based solely on the complaint on which the judge relied in granting K & Z's motion for summary judgment in favor of K & Z. The record which had evolved at the time of the summary judgment motion revealed that Ms. Warren had pled negligence due to the actions of the "unknown cardiologist" whose identity and association with K & Z subsequently became known. Under the particular circumstances of this case, summary judgment in favor of K & Z on plaintiff's second theory of liability was improper.

Plaintiff's general claim for pain and suffering resulting from the negligence of the defendants was dismissed in the motions judge's ruling on defendants' summary judgment motions. The judge fo-

cused on what he perceived as a claim for pain and suffering related to the lung surgery. As he stated, in part:

> Plaintiff [ ] argues that she should be able to recover for any pain and suffering associated with the lung surgery itself, yet such an argument fails to surmount the causation hurdle. There is no dispute decedent needed that surgery; the only issue is whether it should have been performed at the time it was. If performed later, he would have undergone the same post-surgical pain. Even were the Defendants negligent in performing the lung surgery at that time, therefore, such negligence was not the cause of decedent's pain.

The basis for these conclusions, especially the assertion that "[i]f performed later, [Mr. Warren] would have undergone the same post-surgical pain," is not clear. To the extent that the motions judge was relying on his summary of (a) Dr. Sheren's testimony regarding pain and (b) Ms. Warren's testimony about her husband's pain, those summary statements are taken out of context, and the motions judge apparently read the testimony too narrowly and failed to consider all of the evidence in the record at the time of his decision.

The motions judge states that "Plaintiff's expert [Dr. Sheren] testified that he could not say whether any shortness of breath before decedent lapsed into unconsciousness was caused by the decedent's heart or the pain related to the surgery." The deposition transcript reveals that Dr. Sheren was discussing "the best means of diagnosing myocardial infarctions" and "why ... Mr. Warren [did] not pass away until shortly after midnight on June 2nd." In expounding his opinion and answering a followup question about "any clinical sign or symptom" reflecting his view, Dr. Sheren said, in part: "Well, a patient may have chest pain, may complain of shortness of breath. Again, a patient that's postoperative will have some painkillers on board, so chest pain is perhaps not the most reliable indicator at that period of time. The patient may complain of shortness of breath, and you may see signs relating to a decrease in circulation, such as low blood pressure or decreased urine output...." He then referenced "the nurse's notes from that period of time [Mr. Warren] spent on the floor [before being taken to the intensive care unit]," and said: "Actually he [Mr. Warren] was receiving morphine. Whether he was having chest pain due to his heart or chest pain due to his surgery is impossible to say." Read in context, there is more than one reasonable interpretation of Dr. Sheren's testimony.

Concerning Ms. Warren's testimony regarding pain, the motions judge declared: "Plaintiff testified that the only pain her husband complained of on June 1 was from the incision." Ms. Warren testified that on the day her husband died, "he was in a lot of pain, and [she] wanted to stay that night, and before [she] even got home, [the hospital] called and said he was dead." When asked "What makes you think he was in pain," Ms. Warren responded "I asked him if he was in pain and he said yes." Counsel for one of the defendants asked Ms. Warren "Was [Mr. Warren] in pain when you first saw him that morning [June 1]?" After Ms. Warren replied yes, counsel inquired: "Where did he complain of the pain? Was it around the incision where they cut him?" Ms. Warren responded "Yes." Counsel also inquired: "Did your husband complain of anything else other than the pain and the incision when you were there that day? Ms. Warren said 'No.' " The motions judge did not reference Mr. Warren's daughter's deposition which was taken on the same day as Ms. Warren's deposition. Cheryl Warren–Mohr arrived at the hospital on June 1 around 10:30 a.m. and remained there until

around 4:00 p.m. When she asked her father how he felt, "[h]e said he hurt. . . . He said his chest hurt." When counsel inquired whether Mr. Warren seemed to be saying that he hurt where the incision was, Ms. Warren–Mohr stated "He did not point to a place." She recalled that while she was in the room, Dr. Eger discussed "morphine and [her father's] pain." She also observed her father "wince[ ]" in apparent pain and then "push the little button thing" which supplied more morphine to Mr. Warren. The motions judge does not mention all of Ms. Warren's relevant testimony; nor does he cite that of Ms. Warren–Mohr.

■ In ruling in favor of all defendants on the claim of pain and suffering, Judge Boasberg of course did not take into consideration plaintiff's theory concerning the 12–lead EKG and Mr. Warren's myocardial infarction since he was about to grant summary judgment in favor of Dr. Kaufman and K & Z. And, the judge determined that there was no genuine issue as to any material fact, and further, he had to have reasoned according to the appropriate legal standard, see Fred Ezra Co., supra, 687 A.2d at 591, that after taking into consideration all reasonable inferences in the light most favorable to the non-moving party, Ms. Warren, no reasonable juror could find for her. Yet, whether Mr. Warren's myocardial infarction and his pain and suffering were directly and proximately caused by the negligence of the defendants, or constituted a substantial factor in bringing about the myocardial infarction and pain and suffering, involved a genuine dispute over material facts. Hence, the issue was not appropriate for summary judgment because the record contains sufficient evidence for reasonable jurors to conclude that at least some of the defendants violated the applicable standard of care, and to determine that there was a causal relationship between the violation and the alleged harm. See Ferrell, supra, 691 A.2d at 646; Graham v. Roberts, 142 U.S.App.D.C. 305, 308, 441 F.2d 995, 998 (1970). In Shomaker v. George Washington Univ., 669 A.2d 1291 (D.C.1995) we affirmed a judgment awarding no damages for pain and suffering. There the trial court had declared that: "The record is such that reasonable jurors could have concluded that plaintiff suffered no more pain than he would have in any event, even without malpractice, and therefore the jury awarded no [pain and suffering damages]." But that issue concerning pain and suffering damages had been presented to the jury, rather than being resolved on a summary judgment motion. Id. at 1296–97. And, the issue here concerning pain and suffering damages should have gone to the jury. Since the jury found Medlantic and Associated Anesthesiologists not liable, and given our analysis of the evidentiary issue discussed below, our conclusion as to the pain and suffering claim only affects Dr. Kaufman and K & Z.

### The Evidentiary Issue

■ Ms. Warren contends that: "The jury verdict in favor of the remaining Defendants was obtained as a result of undue prejudice to Plaintiff Warren's ability to effectively cross-examine Dr. Wasserman with a consensus statement concerning myocardial infarction" (Myocardial Infarction Redefined—A Consensus Document of the Joint European Society of Cardiology/American College of Cardiology). She claims that because her cross-examination based on the consensus statement was curtailed, "Dr. Wasserman was unfairly allowed to confuse and mislead the jury with his expert testimony as to the cause of [Mr.] Warren's death on June 2, 2000[,]" and also "prevented plaintiff from effectively undermining Dr. Wasserman's unduly heightened credibility and his un-

tenable expert testimony." She further asserts that: "The trial judge's blanket rule barring reading from the consensus statement document erroneously restricted the scope and effective[ness] of cross-examination of Dr. Wasserman and warrants reversal" and "a new trial." Medlantic and Associated Anesthesiologists argue that Ms. Warren "never established that the [c]onsensus [s]tatement was a reliable authority"; had no witness "to explain" the consensus document; improperly sought to impeach Dr. Wasserman even though Dr. Wasserman "conceded his lack of knowledge [of pathology]"; and they also maintain that the trial court committed no prejudicial error in curtailing use of the consensus document during cross-examination of Dr. Wasserman.

The record reveals that during the deposition testimony of Dr. Wasserman, there was one reference to "this consensus statement" by counsel for Ms. Warren, but the statement was not otherwise identified, and the consensus statement was not included in Ms. Warren's pre-trial list of exhibits. Ms. Warren's counsel's second-day cross-examination of Dr. Wasserman at trial began to focus on the Armed Forces Institute of Pathology report on Mr. Warren's death, and to pose questions to Dr. Wasserman about the Institute's findings. Counsel for Associated Anesthesiologists interrupted to object when Ms. Warren's attorney started to ask a declaratory statement question about "contraction band necrosis." Counsel objected to the "reading [of] an article on a subject . . . that hasn't been discussed by any expert." Counsel for Ms. Warren stated that he planned to impeach the testimony of Dr. Wasserman. The trial judge, the Honorable Patricia A. Broderick, responded that counsel could impeach but added: "I don't know what you're impeaching because [Dr. Wasserman] hasn't made any statements on this." When counsel for

Ms. Warren disagreed, the trial court allowed him to impeach, even though copies of the consensus statement apparently had not been pre-distributed to the court. However the trial court cautioned that Dr. Wasserman "didn't say he relied on [the consensus statement]."

Cross-examination continued (for several transcript pages) until counsel for Ms. Warren read a sentence from the "pathology" section of the consensus statement and proceeded to pose several questions about ischemia/infarction, call death/coagulation/contraction band necrosis, oncosis, and apoptosis before reading another sentence from the document pertaining to "careful analysis of histologic sections." Counsel for Associated Anesthesiologists renewed his objection which the trial court sustained, explaining, perhaps inartfully, "You can't do that line of questioning; it's not working." Nevertheless, Judge Broderick permitted counsel to proceed with the cross-examination so long as it fell into the category of impeachment, without reading from the consensus statement. The trial court refused to admit the document into evidence.

■ "The extent and scope of [ ] cross-examination are subject to the broad discretion of the trial judge." *Bobb v. United States*, 758 A.2d 958, 963 (D.C. 2000) (citation omitted). Furthermore, "[t]he determination of what evidence is relevant, and what evidence may tend to confuse the jury, is left to the sound discretion of the trial court." *Caulfield v. Stark*, 893 A.2d 970, 980 (D.C.2006) (citation omitted).

■ Here, counsel for Ms. Warren in essence attempted to get into evidence passages from the consensus statement believed to undermine the credibility and testimony of defendants' expert witness, Dr. Wasserman, a cardiologist who also

served as Chairman of the Department of Medicine at George Washington University. The trial court implicitly recognized that counsel was attempting to get the passages admitted through FEDERAL RULE OF EVIDENCE 803(18) which provides:

> (18) Learned treatises. To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

The trial court pointed out that Dr. Wasserman had not relied on the consensus statement during his direct examination. Therefore, that part of Rule 803(18) was unavailable to counsel for Ms. Warren. Nor had counsel explicitly called Dr. Wasserman's attention to the consensus statement during his deposition, and counsel did not list the document in Ms. Warren's pretrial list of trial exhibits. Even if Dr. Wasserman was aware of and had some familiarity with the consensus statement prior to trial, Rule 803(18) "permits the admission of learned treatises [or passages from learned articles] as substantive evidence ... only when an expert is on the stand and available to explain and assist in the application of the treatise [or article]." *Washington v. United States,* 884 A.2d 1080, 1095 (D.C.2005) (quoting *Tart v. McGann,* 697 F.2d 75, 78 (2d Cir.1982)) (internal quotation marks omitted). Dr. Wasserman stated that he was not a pathologist; therefore, he was not the proper person, and indeed could not, "explain and assist in the application" of the consensus statement. Under the circumstances,

Judge Broderick properly exercised her discretion in permitting cross-examination so long as it fell into the impeachment category, but disallowing use of the consensus statement as substantive evidence. *See Johnson v. United States,* 398 A.2d 354 (D.C.1979). In short, reversal is unwarranted in this case.

Accordingly, for the foregoing reasons, we reverse the order of the motions judge granting summary judgment to defendants Dr. Kaufman & K & Z, and remand the case for trial as to those defendants. However, we affirm the judgment of the trial court as to defendants Medlantic and Associated Anesthesiologists.

*So ordered.*